| | | |
|---|---|---|
| MICHELLE LAWRENCE, DERIVATIVELY AND ON BEHALF OF ITT EDUCATIONAL SERVICES, INC., | ) ) ) ) | Case No. 1:14-cv-2106 **VERIFIED SHAREHOLDER** **DERIVATIVE COMPLAINT FOR:** |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **(1) BREACH OF FIDUCIARY DUTY;** **(2) CORPORATE WASTE;** **(3) GROSS MISMANAGEMENT; AND** |
| KEVIN M. MODANY, DANIEL M. FITZPATRICK, JOHN E. DEAN, JOHN F. COZZI, JAMES D. FOWLER, JR., JOANNA T. LAU, VIN WEBER AND JOHN A. YENA, | ) ) ) ) ) | **(4) UNJUST ENRICHMENT** **JURY TRIAL DEMANDED** |
| Defendants, | | |
| And | | |
| ITT EDUCATIONAL SERVICES, INC., | | |
| Nominal Defendant. | | |

Plaintiff Michelle Lawrence ("Plaintiff"), by her undersigned attorneys, derivatively and

on behalf of Nominal Defendant ITT Technologies, Inc. ("ITT," or the "Company"), files this

Verified Shareholder Derivative Complaint against Individual Defendants Kevin M. Modany,

Daniel M. Fitzpatrick, John E. Dean, John F. Cozzi, James D. Fowler, Jr., Joanna T. Lau, Vin

Weber, and John A. Yena (collectively, the "Individual Defendants") for breaches of their

fiduciary duties as directors and/or officers of ITT, gross mismanagement, abuse of control, and

unjust enrichment for her complaint against Individual Defendants, alleges the following based

upon personal knowledge as to herself and her own acts, and information and belief as to all

other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys,

which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding ITT, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action which seeks to remedy wrongdoing committed by ITT's directors and officers between April 26, 2013 and September 19, 2014, both dates inclusive (the "Relevant Period").

2.      Nominal Defendant ITT provides accredited, technology-oriented undergraduate and graduate degree programs through its ITT Technical Institutes and Daniel Webster College.

3.      ITT has agreements with unrelated parties that made private education loans available to ITT students to help pay the students' cost of education that student financial aid from federal, state and other sources did not cover (the "PEAKS Program"), pursuant to which: an unaffiliated lender originated private education loans to ITT eligible students and, subsequently, sold those loans to an unaffiliated trust that purchased, owns and collects private education loans (the "PEAKS Trust"); the PEAKS Trust issued senior debt in the aggregate principal amount of $300.0 million (the "PEAKS Senior Debt") to investors; and ITT guarantees payment of the principal, interest and, prior to February 2013, certain call premiums owed on the PEAKS Senior Debt, the administrative fees and expenses of the PEAKS Trust and the required

ratio of assets of the PEAKS Trust to outstanding PEAKS Senior Debt (the "PEAKS Guarantee").

4. According to ITT, since February 28 2013, ITT had the ability to exercise its right to terminate the servicing agreement that governs the servicing activities of the PEAKS Trust Student Loans ("PEAKS Servicing Agreement"), due to the failure of the entity that performs those servicing activities on behalf of the PEAKS Trust to meet certain performance criteria specified in the PEAKS Servicing Agreement ("Right to Terminate").

5. Because ITT had the Right to Terminate the PEAKS Servicing Agreement since February 28, 2013, ITT had the power to direct the activities of the PEAKS Trust that most significantly impact the economic performance of the PEAKS Trust.

6. Because ITT had the power to direct the activities of the PEAKS Trust that most significantly impact the economic performance of the PEAKS Trust, ITT was the primary beneficiary of the PEAKS Trust since February 28, 2013.

7. As the primary beneficiary of the PEAKS Trust since February 28, 2013, ITT was required to consolidate the PEAKS Trust in the Company's consolidated financial statements beginning on February 28, 2013.

8. Yet, ITT did not consolidate the PEAKS Trust in the Company's consolidated financial statements beginning on February 28, 2013 in its unaudited financial statements in its quarterly reports filed on Form 10-Q with the SEC for each of the fiscal quarters ended March 31, 2013, June 30, 2013, and September 30, 2013.

9. The Individual Defendants breached their fiduciary duties by causing the Company to issue false and misleading statements of material fact in the Company's consolidated

financial statements in its quarterly reports filed on Form 10-Q with the SEC for each of the fiscal quarters ended March 31, 2013, June 30, 2013, and September 30, 2013 and in the Company's earnings report for the fiscal quarter ended December 31, 2014 issued on Form 8-K filed with the SEC due to failing to consolidate the PEAKS Trust in those consolidated financial statements. The Individual Defendants made those false and misleading statements of material fact despite that their falsity was known to the Individual Defendants or were recklessly disregarded by them at the time they were made, as the Company's independent auditor, PricewaterhouseCoopers ("PWC") found and disclosed to the Company that ITT was required to consolidate the PEAKS Trust in the Company's consolidated financial statements.

10.    The Individual Defendants also breached their fiduciary duties by falsely representing that ITT maintained adequate internal controls when, in fact, the Individual Defendants knew, or recklessly disregarded, that such controls were materially deficient, and by not maintaining such adequate internal controls. The Company's lack of adequate internal controls has caused the Company to make the aforementioned false and misleading statements.

11.    These breaches of fiduciary duty have subjected the Company to multiple federal securities fraud class action lawsuits, have caused it to restate the Company's consolidated financial statements financial statements in its quarterly reports filed on Form 10-Q with the SEC for each of the fiscal quarters ended March 31, 2013, June 30, 2013, and September 30, 2013, have caused it to receive a Wells Notice from the SEC, notifying the Company that the Staff had made a preliminary determination to recommend that the SEC file an enforcement action against the Company, have caused it--the Company believes--to "be required to make additional payments under the PEAKS Guarantee of approximately $115.3 million in the remainder of 2014

related to its obligations under the PEAKS Guarantee," have caused it--the Company believes--to be in default in a credit agreement for which the associated debt "may be declared immediately due and payable. The borrowings under the Credit Agreement currently total $50.0 million," and have caused the U.S. Department of Education ("ED") to require the Company's institutions to "submit a letter of credit payable to the ED in the amount of $79,707,879...," and will therefore cost the Company many millions upon millions of dollars.

12.     As a result of Defendants' false and misleading statements, the price of ITT common stock traded at artificially inflated prices throughout the Relevant Period. Before the truth disclosing Defendants' fraud began to be disclosed, the Company's stock price was $29.95 per share at closing on March 21, 2014.

13.     Upon the Company's gradual disclosures of the Defendants' fraud, ITT stock price fell drastically. ITT's stock price fell to $27.21 per share on March 24, 2014. It fell by $5.30 on May 22, 2014 to close at $20.50 per share. After September 19, 2014's corrective disclosure, the stock price fell by $2.70 to close at $4.95 per share.

14.     In light of the Individual Defendants' conduct, which has subjected the Company, CEO, and CFO to being named as defendants in several federal securities fraud class action lawsuits, and for the Company to be the subject of the SEC's investigation, a majority of the Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

15.     The Company has been substantially damaged as a result of the Individual Defendants' knowing breaches of fiduciary duty and other misconduct.

## JURISDICTION AND VENUE

16.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332.  Plaintiff and Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

17.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this District, or is an individual who is a citizen of Indiana or who has minimum contacts with this District to justify the exercise of jurisdiction over them.

18.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, one or more of the Defendants either resides or maintains executive offices in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

19.     Plaintiff is a current shareholder of ITT.  Plaintiff has been a shareholder of ITT common stock since before the beginning of the Relevant Period, and has continuously held ITT common stock at all relevant times.  Plaintiff is a citizen of Florida.

20.     Nominal Defendant ITT is a Delaware corporation with its principal place of business located in Carmel, Indiana. ITT provides accredited, technology-oriented undergraduate and graduate degree programs through its ITT Technical Institutes and Daniel Webster College. As of September 30, 2013, the Company offered master, bachelor, and associate degree programs to approximately 61,000 students at ITT Technical Institute and Daniel Webster College locations; and short-term information technology and business learning solutions for

individuals. The Company operates approximately 149 college locations (including 147 campuses and two learning sites) in 39 states and one training facility. During the Relevant Period, the Company's stock was listed on the NYSE under ticker "ESI." ITT is a citizen of the state of Indiana.

21. Defendant Kevin M. Modany ("Modany") has been, at all relevant times, Chief Executive Officer ("CEO"). Modany was Chairman of the Company's Board until he announced his resignation as Chairman and director on August 4, 2014. Modany also announced on August 4, 2014 that he would resign as CEO, effective February 4, 2014. Modany is a citizen of Indiana.

22. Defendant Daniel M. Fitzpatrick ("Fitzpatrick") has been, at all relevant times, Chief Financial Officer ("CFO") and Executive Vice President of ITT. Fitzpatrick is a citizen of Indiana.

23. Defendant John E. Dean ("Dean") has been the Company's Executive Chairman of the Board since August, 2014. Dean has been a Company Director since 1994. Dean served as Chairman of the Audit Committee until his appointment as Executive Chairman of the Board on August 4, 2014, after which time Dean ceased to be a member of the Audit Committee.

24. Defendant John F. Cozzi ("Cozzi") has been a Company Director at all relevant times. He has been a Director since 2003. Cozzi serves on ITT's Audit Committee and Compensation Committee. Cozzi is a citizen of Illinois.

25. Defendant James D. Fowler, Jr. ("Fowler") has been a Company Director at all relevant times. He has been a Director since 1994. Fowler serves on ITT's Compensation Committee. Fowler is a citizen of Virginia.

26.     Defendant Joanna T. Lau ("Lau") has been a Company Director at all relevant times.  She has been a Director since 2003. Lau serves on ITT's Audit Committee.   Lau is a citizen of Massachusetts.

27.     Defendant Vin Weber ("Weber") has been a Company Director at all relevant times.  He has been a Director since 1994. Weber serves on ITT's Nominating and Corporate Governance Committee.  Weber is a citizen of Virginia.

28.     Defendant John A. Yena ("Yena") has been a Company Director at all relevant times.  He has been a Director since 2006. Yena is Chairman of ITT's Compensation Committee and is a member of the Nominating and Corporate Governance Committee.  Yena is a citizen of Rhode Island.

## DIRECTORS WHO ARE NOT DEFENDANTS

29.     Thomas I. Morgan ("Morgan") has been a Company Director at all relevant times. He has been a Director since January 2013. He previously served as a Director of the Company from May 2006 to June 2008.  Morgan serves on ITT's Audit Committee. Morgan served as Chairman of the Audit Committee starting on August 4, 2014, replacing Defendant Dean, until sometime after September 17, 2014--the date that non-defendant Jerry Cohen was appointed a Company Director, when Cohen replaced Morgan as Chairman of the Audit Committee.

30.     Samuel L. Odle ("Odle") has been a Company Director at all relevant times.  He has been a Director since 2006. Odle serves on ITT's Compensation Committee and is Chairman of the Nominating and Corporate Governance Committee.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

31.     By reason of their positions as officers, directors and/or fiduciaries of ITT and because of their ability to control the business and corporate affairs of ITT, the Individual Defendants owed ITT and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage ITT in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of ITT and its shareholders so as to benefit all shareholders equally.

32.     Each director and officer of the Company owes to ITT and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

33.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of ITT, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

34.     To discharge their duties, the officers and directors of ITT were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

35.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of ITT, the absence of good faith on their

part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company, including causing the Company to issue false and misleading statements of material fact in the Company's consolidated financial statements in its quarterly reports filed on Form 10-Q with the SEC for each of the fiscal quarters ended March 31, 2013, June 30, 2013, and September 30, 2013 and in the Company's earnings report for the fiscal quarter ended December 31, 2014 issued on Form 8-K filed with the SEC due to failing to consolidate the PEAKS Trust in those consolidated financial statements. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the ITT's Board at all relevant times. Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to issue false and misleading statements of material fact in the Company's consolidated financial statements in its quarterly reports filed on Form 10-Q with the SEC for each of the fiscal quarters ended March 31, 2013, June 30, 2013, and September 30, 2013 and in the Company's earnings report for the fiscal quarter ended December 31, 2014 issued on Form 8-K filed with the SEC due to failing to consolidate the PEAKS Trust in those consolidated financial statements, and by not maintaining adequate internal controls.

36.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NYSE, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present

and future business prospects, including by failing to consolidate the PEAKS Trust in the Company's consolidated financial statements in its quarterly reports filed on Form 10-Q with the SEC for each of the fiscal quarters ended March 31, 2013, June 30, 2013, and September 30, 2013 and in the Company's earnings report for the fiscal quarter ended December 31, 2014 issued on Form 8-K filed with the SEC, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing ITT to make false and misleading statements of material fact in the Company's consolidated financial statements in its quarterly reports filed on Form 10-Q with the SEC for each of the fiscal quarters ended March 31, 2013, June 30, 2013, and September 30, 2013 and in the Company's earnings report for the fiscal quarter ended December 31, 2014 issued on Form 8-K filed with the SEC due to failing to consolidate the PEAKS Trust in those consolidated financial statements, and in failing to disclose that ITT was not maintaining adequate internal controls.

37. To discharge their duties, the officers and directors of ITT were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of ITT were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, the United States, and pursuant to the ITT's own Code of Business Conduct and Ethics and internal guidelines;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how ITT conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of ITT and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that ITT's operations would comply with all laws and ITT's financial statements filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate; and

(g)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(h)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

38.     Each of the Individual Defendants further owed to ITT and the shareholders the duty of loyalty requiring that each favor ITT's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

39.     At all times relevant hereto, the Individual Defendants were the agents of each other and of ITT and were at all times acting within the course and scope of such agency.

40.     Because of their advisory, executive, managerial, and directorial positions with ITT, each of the Individual Defendants had access to adverse, non-public information about the Company.

41.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ITT.

42.     In addition, the Individual Defendants' actions and course of conduct has subjected the Company to multiple federal securities fraud class action lawsuits, have caused it to restate the Company's consolidated financial statements financial statements in its quarterly reports filed on Form 10-Q with the SEC for each of the fiscal quarters ended March 31, 2013, June 30, 2013, and September 30, 2013, have caused it to receive a Wells Notice from the SEC, notifying the Company that the Staff had made a preliminary determination to recommend that the SEC file an enforcement action against the Company, have caused it--the Company believes-

-to "be required to make additional payments under the PEAKS Guarantee of approximately $115.3 million in the remainder of 2014 related to its obligations under the PEAKS Guarantee," have caused it--the Company believes--to be in default in a credit agreement for which the associated debt "may be declared immediately due and payable. The borrowings under the Credit Agreement currently total $50.0 million," and have caused the ED to require the Company's institutions to "submit a letter of credit payable to the ED in the amount of $79,707,879..." As a result, ITT has expended, and will continue to expend, substantial sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

43. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

44. During the Relevant Period, the Individual Defendants collectively and individually initiated a course of conduct to enter the Agreement despite that it was not commercially viable, and to issue false and misleading statements of material fact that failed to disclose and misrepresented adverse facts that were known to the Individual Defendants or were recklessly disregarded by them at the time they were made, including that the Company caused ITT to make false and misleading statements of material fact in the Company's consolidated financial statements in its quarterly reports filed on Form 10-Q with the SEC for each of the fiscal quarters ended March 31, 2013, June 30, 2013, and September 30, 2013 and in the Company's earnings report for the fiscal quarter ended December 31, 2014 issued on Form 8-K

filed with the SEC due to failing to consolidate the PEAKS Trust in those consolidated financial statements, and in failing to disclose that ITT was not maintaining adequate internal controls. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein.

45. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused ITT to make false and misleading statements of material fact in the Company's consolidated financial statements in its quarterly reports filed on Form 10-Q with the SEC for each of the fiscal quarters ended March 31, 2013, June 30, 2013, and September 30, 2013 and in the Company's earnings report for the fiscal quarter ended December 31, 2014 issued on Form 8-K filed with the SEC due to failing to consolidate the PEAKS Trust in those consolidated financial statements, and in failing to disclose that ITT was not maintaining adequate internal controls.

46. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (1) disguise the Individual Defendants' violations of federal securities laws and breaches of fiduciary duty, and unjust enrichment; (2) disguise and misrepresent the valuation of the Company; and (3) artificially inflate the Company stock price.

47. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

48. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the

commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## CODE OF BUSINESS CONDUCT AND ETHICS
## AND AUDIT COMMITTEE CHARTER

49. The conduct of all of the Company's officers, directors, and employees is governed by the Code of Business Conduct and Ethics (the "Code of Ethics").

50. The Company's Audit Committee is governed by the Audit Committee Charter.

### Code of Business Conduct and Ethics

51. The Code of Ethics states:

ITT/ESI operates its business in accordance with the highest ethical standards and all applicable laws, regulations and rules. The company places the highest value on the integrity of each of its employees, representatives and directors. In addition, all directors, employees, agents, consultants and representatives of ITT/ESI are responsible for complying with all applicable laws, regulations and rules, in both the United States and other countries. ITT/ESI's corporate culture demands not only legal compliance, but also responsible and ethical behavior.

Unless otherwise specifically noted, the policies in this Code apply across ITT/ESI, in all subsidiaries, businesses, countries and states. The Code does not cover all ITT/ESI policies or all laws. If a law, regulation or rule conflicts with a policy in this Code, you must comply with the law, regulation or rule. Your business or state may have policies and practices which require more of you than is required by this Code, and the same may be true of local law. In all of those instances, you must follow the stricter policy, practice or law. Think of this Code as a baseline, or a minimum requirement, which must always be followed. The only time you can go below the baseline is if a law, regulation or rule absolutely requires you to do so.

ITT/ESI's Chief Executive Officer is the only person who can waive compliance with any policy in this Code by any ITT/ESI employee (except for ITT/ESI executive officers), agent, consultant or representative. Any waiver of compliance with any policy in this Code by any ITT/ESI director or executive officer can only be made by ITT/ESI's Board of Directors and must be promptly disclosed to ITT/ESI shareholders.

52.     The Code of Ethics provides, as to "Full, Fair, Accurate, Timely And Understandable Disclosure," that:

> It is ITT/ESI's policy to provide full, fair, accurate, timely and understandable disclosures in all reports and documents that ITT/ESI files with or submits to the Securities and Exchange Commission, as well as in all other public communications made by ITT/ESI. In furtherance of this policy, ITT/ESI's executive officers will design, implement and amend as necessary disclosure controls and procedures and internal controls for financial reporting (collectively "Controls and Procedures"). All ITT/ESI officers, directors and employees will comply with the Controls and Procedures to promote full, fair, accurate, timely and understandable disclosures by ITT/ESI.

> Employees can express any complaints or concerns they may have regarding ITT/ESI's accounting, internal accounting controls or auditing matters to the Audit Committee of ITT/ESI's Board of Directors by contacting the Chief Compliance Officer, which can be done on a confidential or anonymous basis. The Chief Compliance Officer will cause any such complaint or concern to be presented to the Audit Committee, which will direct an investigation of such complaint or concern. The Audit Committee will determine what action, if any, is appropriate based on the results of its investigation and will ensure that ITT/ESI carries out any such action. If the employee identifies himself or herself and requests a report on the disposition of the complaint or concern, the Chief Compliance Officer will provide the employee with such a report. If the employee chooses to remain anonymous, he or she may arrange for the Chief Compliance Officer to provide the employee a case reference number. Thereafter, the employee may call the Chief Compliance Officer, mention the case reference number and receive a report.

53.     The Code of Ethics provides, as to "Voluntary Disclosure Of Irregularities," that:

> ITT/ESI is committed to operating its worldwide business in accordance with the highest level of integrity and ethical standards. Should an improper practice or irregularity occur within the company, the company is committed to making all necessary corrections, taking remedial action to prevent recurrence and making timely and appropriate disclosure of the improper practices or irregularities to the proper authorities.

54.     The Code of Ethics provides, as to "Fair Dealing," that:

> ITT/ESI directors and employees must deal fairly with the company's customers, suppliers, competitors and employees. No unfair advantage should be taken of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair practice.

55.     The Code of Ethics provides, as to "Protection And Proper Use Of Corporate Assets," that:

> ITT/ESI directors and employees must protect company assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on ITT/ESI's profitability. All ITT/ESI assets should be used for legitimate business purposes.

56.     The Code of Ethics provides, as to "Fraud, Theft Or Similar Conduct," that:

> Any act that involves theft, fraud, embezzlement or misappropriation of any property, including that of the company or any of its directors, employees, suppliers or customers, is prohibited.

57.     The Code of Ethics provides, as to "Maintain Accurate And Complete Records," that:

> Every employee has the responsibility to maintain accurate and complete records. No false, misleading or artificial entries may be made on ITT/ESI's books and records. No funds or assets may be maintained by the company for any illegal or improper purposes. All transactions must be fully and completely documented and recorded in the company's accounting records.

58.     Throughout the Relevant Period, in violation of the Code of Ethics, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's internal controls over public reporting of transactions and consciously disregarded their duties to monitor such controls over reporting, and consciously disregarded their duties to protect corporate assets. The Individual Defendants' complete failure to perform their duties in good faith resulted in fraudulent misrepresentations to the SEC, the investing public, and the Company's shareholders, and in engagement in conduct that was not in the best interest of the Company.

**Audit Committee Charter**

59.     At all times during the Relevant Period, Morgan and Defendants Cozzi and Lau

served on the Company's Audit Committee.   Since the beginning of the Relevant Period,

Defendant Dean served as Chairman of the Audit Committee until his appointment as Executive

Chairman of the Board on August 4, 2014, after which time Defendant Dean was replaced by

Morgan, who was a member of the Audit Committee since January 2013, as Chairman of the

Audit Committee.  After August 4, 2014, Defendant Dean no longer served as a member of the

Audit Committee.   Non-defendant Jerry Cohen, who was appointed a Company Director

effective on September 17, 2014, became a member of the Audit Committee, of which Cohen is

the Chairman.  As members of the Audit Committee, they had an affirmative duty of oversight

and responsibility for the integrity of ITT's disclosures.

60.     According to the Company's proxy statement filed with the SEC on November

24, 2014:

> The Audit Committee is specifically tasked with, among other things:
> •       reviewing with our management and our independent registered public accounting
> firm our risk assessment and risk management, including:
> •       the guidelines and policies governing the process by which management assesses
> and manages our exposure to risk, and
> •       our major financial risk exposures and the steps taken by management to monitor
> and control those exposures;
> •       overseeing our systems of internal controls regarding finance, accounting, legal
> compliance and ethics;
> •       periodically reviewing legal, regulatory and related governmental policy matters;
> and
> •       reviewing management policies and programs relating to our compliance with
> legal and regulatory requirements, business ethics, business integrity, conflicts of interest
> and environmental matters.
>
> ****
>
> The functions of the Audit Committee are to assist the Board of Directors in its oversight
> of:

- the integrity of our financial statements and other financial information provided by us to any governmental body or the public;
- our compliance with legal and regulatory requirements;
- our systems of internal controls regarding finance, accounting, legal compliance and ethics that our management and the Board of Directors establish;
- our auditing, accounting and financial reporting processes generally;
- the qualifications, independence and performance of our independent registered public accounting firm; and
- the performance of our compliance and internal audit functions.

61.     The Audit Committee Charter provides, as to "Scope Of Responsibility," that:

The Audit Committee ("Committee") of the ITT Educational Services, Inc. ("ITT/ESI") Board of Directors ("Board") will assist the Board in its oversight of:
(a) the integrity of ITT/ESI's financial statements and other financial information provided by ITT/ESI to any governmental body or the public;
(b) ITT/ESI's compliance with legal and regulatory requirements;
(c) ITT/ESI's systems of internal controls regarding finance, accounting, legal compliance and ethics that ITT/ESI management ("management") and the Board establish;
(d) ITT/ESI's auditing, accounting and financial reporting processes generally;
(e) the qualifications, independence and performance of ITT/ESI's independent registered public accounting firm ("Accounting Firm"); and
(f) the performance of ITT/ESI's compliance and internal audit functions.

62.     The Audit Committee Charter provides, as to "Structure And Processes," that:

1. <u>General.</u> The Committee will:
(a) meet at least once each quarter and may invite members of management or others to attend Committee meetings and provide pertinent information;
(b) meet regularly (at least quarterly) in separate executive sessions with (i) management, (ii) representatives of the Accounting Firm and (iii) ITT/ESI's Chief Compliance Officer or other official responsible for ITT/ESI's compliance and internal audit functions ("CCO") to discuss any matters that the Committee, management, the Accounting Firm or the CCO believes should be discussed privately with the Committee;
(c) provide an open avenue of communication among the Accounting Firm, the CCO and the Committee;
(d) report regularly to the Board on significant matters within the Committee's scope of responsibility, including any issues that arise with respect to:
    (i) the quality or integrity of ITT/ESI's financial statements;
    (ii) ITT/ESI's compliance with legal and regulatory requirements; and
    (iii) the performance of the CCO;

(e) periodically review with ITT/ESI's general counsel legal, regulatory and related governmental policy matters that may have a material impact on ITT/ESI's financial statements, legal and regulatory compliance and programs;

(f) when appropriate, conduct or authorize investigations into any matters within the Committee's scope of responsibility;

(g) provide such disclosures and reports as may be required of the Committee by the U.S. Securities and Exchange Commission ("SEC") in ITT/ESI's proxy statement for its annual meeting of shareholders;

(h) annually review this Charter and update it as necessary;

(i) establish procedures for:

     (i) the receipt, retention and treatment of complaints received by ITT/ESI regarding accounting, internal accounting controls or auditing matters; and

     (ii) confidential, anonymous submissions by ITT/ESI employees of concerns regarding questionable accounting or auditing matters;

(j) conduct an annual performance evaluation of the Committee;

(k) review the results of the CCO's annual:

     (i) audit of director and ITT/ESI officer expense accounts, management perquisites and management's use of corporate assets; and

     (ii) monitoring of ITT/ESI's compliance with the ITT/ESI Code of Business Conduct and Ethics;

(l) review management policies and programs relating to ITT/ESI's compliance with legal and regulatory requirements, business ethics, business integrity, conflicts of interest and environmental matters; and

(m) perform such other functions as assigned by law, the NYSE, ITT/ESI's Certificate of Incorporation or By-Laws or the Board.

2. <u>Oversight of ITT/ESI's Relationship with the Accounting Firm.</u> The Committee will:

(a) be directly responsible for the appointment, compensation, retention and oversight of the work of the Accounting Firm, including the resolution of disagreements between management and the Accounting Firm regarding financial reporting;

(b) approve, in advance, all audit (including comfort letters and statutory audits) and permitted non-audit services, and related fees and terms, to be performed by the Accounting Firm for ITT/ESI;

(c) evaluate the qualifications, performance and independence of the Accounting Firm, taking into account the opinions of management and the CCO, including:

     (i) a review and evaluation of the lead partner of the Accounting Firm;

     (ii) reviewing the report described in (e)(iv) below;

     (iii) reviewing the Accounting Firm's work throughout the year;

     (iv) confirming that the lead audit partner or the audit partner responsible for reviewing the audit is rotated every five years;

     (v) considering whether there should be regular rotation of the Accounting Firm;

     (vi) actively engaging in a dialogue with the Accounting Firm with respect to any disclosed relationships or services that may impact the objectivity or independence of the Accounting Firm;

(vii) setting clear policies regarding ITT/ESI's hiring of employees or former employees of the Accounting Firm;

(viii) obtaining confirmation and assurance from the Accounting Firm of its independence;

(ix) taking appropriate action to ensure the independence of the Accounting Firm; and

(x) presenting the Committee's conclusion to the Board;

(d) when appropriate, discharge and replace the Accounting Firm;

(e) instruct the Accounting Firm:

(i) that the Accounting Firm reports directly to the Committee and is ultimately accountable to the Committee;

(ii) to conduct an interim financial review of ITT/ESI's financial statements prior to ITT/ESI's quarterly filing of its Form 10-Q with the SEC;

(iii) to report to the Committee:

(A) all critical accounting policies and practices to be used by ITT/ESI;

(B) all alternative disclosures and treatments of financial information within Generally Accepted Accounting Principles ("GAAP") that have been discussed with management, the ramifications of the use of such alternative disclosures and treatments, and the disclosures and treatment preferred by the Accounting Firm;

(C) any material written communications between the Accounting Firm and management, such as any management letter or schedule of unadjusted differences; and

(D) any other matters required to be communicated to the Committee by applicable standards of the Public Company Accounting Oversight Board (the "PCAOB"); and

(iv) to submit annually to the Committee a formal, written report describing:

(A) the Accounting Firm's internal quality control procedures;

(B) any material issues raised by the most recent internal quality control review, peer review, or PCAOB review or inspection of the Accounting Firm;

(C) any material issues raised by any inquiry or investigation of the Accounting Firm by governmental or professional authorities, within the preceding five years, with respect to any audit by the firm, and any steps taken to deal with any such issues; and

(D) all relationships between the Accounting Firm and ITT/ESI.

3. Oversight of the CCO, Audit Matters and Financial Statements and Disclosures. The Committee will:

(a) obtain confirmation and assurance from the CCO of his/her objectivity;

(b) instruct management and the Accounting Firm to provide the Committee with a timely analysis of significant current financial reporting issues and practices;

(c) inquire about, consider and review with the Accounting Firm, the CCO and management:

(i) ITT/ESI's annual and quarterly financial statements, including the Management's Discussion and Analysis of Financial Condition and Results of Operations;

(ii) any ITT/ESI transactions or arrangements that are important for understanding ITT/ESI's financial statements;

(iii) any material financial or non-financial arrangements of ITT/ESI, or offbalance sheet structures, which do not appear on ITT/ESI's financial statements;

(iv) management's and the Accounting Firm's qualitative judgments regarding the appropriateness of the:

(A) critical accounting principles and financial disclosure practices used, or proposed to be adopted, by ITT/ESI;

(B) degree of aggressiveness or conservatism of ITT/ESI's accounting principles and underlying estimates, including the Accounting Firm's views on whether management's choices of accounting principles are conservative, moderate or aggressive from the perspective of income, asset and liability recognition, and whether those principles are common practices or are minority practices;

(C) consistency of application of ITT/ESI's accounting policies; and

(D) clarity, consistency and completeness of the accounting information contained in ITT/ESI's financial statements and related disclosures;

(v) any proposed changes in ITT/ESI's selection or application of accounting principles;

(vi) any analyses prepared by management, the Accounting Firm or the CCO regarding significant financial reporting issues and judgments made in connection with the preparation of ITT/ESI's financial statements, including the effects of alternative GAAP methods on the financial statements;

(vii) the effect of regulatory and accounting initiatives on ITT/ESI's financial statements;

(viii) earnings press releases, including the use of pro forma or adjusted non-GAAP information;

(ix) financial information and earnings guidance provided to security analysts and rating agencies;

(x) ITT/ESI's risk assessment and risk management, including:

(A) the guidelines and policies governing the process by which management assesses and manages ITT/ESI's exposure to risk; and

(B) ITT/ESI's major financial risk exposures and the steps taken by management to monitor and control those exposures;

(xi) any significant adjustments, management judgments, accounting estimates, new or changed accounting policies, uncertainties, timing of transactions or timing of the recording of transactions;

(xii) the Accounting Firm's:

(A) views of the appropriateness of the accounting principles and disclosure practices adopted and/or changed by management from time to time; and

(B) rationale for accepting or questioning any significant estimates by management; and

(xiii) any items that have a significant impact on the representational faithfulness, verifiability, neutrality and consistency of the accounting information included in ITT/ESI's financial statements;

(d) recommend to the Board whether ITT/ESI's audited financial statements should be included in ITT/ESI's Annual Report on Form 10-K filed with the SEC;

(e) inquire about, consider and review with the Accounting Firm, the CCO and management:

(i) the coordination of audit efforts to assure completeness of coverage, reduction of redundant efforts and the effective use of audit resources;

(ii) the adequacy of ITT/ESI's internal accounting and financial controls, including:

(A) any significant deficiencies in the design or operation of the internal controls;

(B) any material weaknesses in the internal controls;

(C) any special steps adopted in light of any material control deficiencies;

(D) any fraud (whether or not material) that involves management or ITT/ESI employees who have a significant role in the internal controls; and

(E) the responsibilities, budget and departmental staffing of the CCO;

(iii) the audit scope, plan and timing of the Accounting Firm and the CCO, and any changes thereto;

(iv) any other matters related to the conduct of the audit or reviews which are to be communicated by the Accounting Firm to the Committee under Generally Accepted Auditing Standards;

(v) any audit problems, difficulties or disputes encountered by the Accounting Firm or the CCO in the course of their audit work, and management's response thereto, including:

(A) any restrictions on the scope of the Accounting Firm's or the CCO's activities;

(B) any restrictions on the Accounting Firm's or the CCO's access to requested information;

(C) any significant disagreements between the Accounting Firm or the CCO and management;

(D) any accounting adjustments that were noted or proposed by the Accounting Firm but were not made by management;

(E) any communications between the Accounting Firm's audit team and its national office regarding audit or accounting issues presented by the ITT/ESI engagement;

(F) any "management" or "internal control" letter issued, or proposed to be issued, by the Accounting Firm to ITT/ESI; and

(vi) any significant audit findings and recommendations of the Accounting Firm and the CCO, together with management's responses thereto.

63.     Throughout the Relevant Period, in violation of the Audit Committee Charter, the Individual Defendants who were members of the Audit Committee conducted little, if any, oversight of the Company's internal controls over public reporting of transactions, of the Company's financial statements and disclosures, and of the Company's relationship with its independent auditor, consciously disregarded their duties to conduct oversight of the same, and consciously disregarded their duties to protect corporate assets. The Audit Committee members' complete failure to perform their duties in good faith resulted in fraudulent misrepresentations to the SEC, the investing public, and the Company's shareholders, and in engagement in conduct that was not in the best interest of the Company.

## DEFENDANTS' MISCONDUCT

64.     ITT was required to consolidate the PEAKS Trust in the Company's consolidated financial statements beginning on February 28, 2013, as since that date ITT had the Right To Terminate the PEAKS Servicing Agreement, which bestowed on ITT the power to direct the activities of the PEAKS Trust that most significantly impact the economic performance of the PEAKS Trust, thus causing ITT to be the primary beneficiary of the PEAKS Trust.

65.     Yet, ITT did not consolidate the PEAKS Trust in the Company's consolidated financial statements in its quarterly reports filed on Form 10-Q with the SEC for each of the fiscal quarters ended March 31, 2013, June 30, 2013, and September 30, 2013, and in its January 30, 2014 press release announcing its financial results for the three month period and fiscal year ending on December 31, 2013.

66.     The Individual Defendants caused ITT not to consolidate the PEAKS Trust in the Company's consolidated financial statements in its quarterly reports filed on Form 10-Q with the

SEC for each of the fiscal quarters ended March 31, 2013, June 30, 2013, and September 30, 2013 because by not consolidating, shareholders' equity for each of those quarters was artificially increased by about 50%, and the aggregate earnings per share for those three quarters was artificially increased by about 600% from $0.52 per share to $3.03 per share. For the same reasons, the Individual Defendants caused ITT not to consolidate the PEAKS Trust in the Company's consolidated financial statements in its January 30, 2014 press release announcing its financial results for the three month period and fiscal year ending on December 31, 2013.

67.     The Individual Defendants caused ITT not to consolidate the PEAKS Trust in the Company's consolidated financial statements in its quarterly reports filed on Form 10-Q with the SEC for each of the fiscal quarters ended March 31, 2013, June 30, 2013, and September 30, 2013, and in its January 30, 2014 press release announcing its financial results for the three month period and fiscal year ending on December 31, 2013 because by not consolidating, and thus artificially overstating the Company's total assets less total liabilities (the difference being total shareholders' equity), and overstating net income and earnings per share, they caused the price of ITT stock to be artificially inflated.

68.     On November 20, 2014, ITT announced on Form 8-K/A filed with the SEC that the Individual Defendants had known at the time they caused the Company to make the aforementioned false and misleading statements of material fact that such statements were false and misleading.  Indeed, the Company stated that its independent auditor, PWC, advised them that ITT was required to consolidate the PEAKS Trust in the Company's consolidated financial statements beginning on February 28, 2013.

69.     The November 20, 2014 8-K/A thus stated, in pertinent part:

[There was] a disagreement [with PWC] relating to whether or not the Company was required to consolidate a variable interest entity (the "PEAKS Trust") in its financial statements. In connection with the Company's submission of an inquiry to the Office of the Chief Accountant (the "OCA") of the SEC related to whether the financial results of the PEAKS Trust should be consolidated in the Company's consolidated financial statements and, if so, during which periods, the Company concluded that it was not required to consolidate the PEAKS Trust. PWC had evaluated the matter which was the subject of the submission to the OCA and concluded that the Company should consolidate the PEAKS Trust. As previously reported, in June 2014, the Audit Committee of the Board of Directors of the Company determined that, beginning on February 28, 2013, the Company should have consolidated the PEAKS Trust in the Company's consolidated financial statements. As a result, the disagreement on this matter was resolved to PWC's satisfaction. The Audit Committee of the Board of Directors of the Company has discussed the subject matter of the disagreement with PWC, and the Company has authorized PWC to respond fully to the inquires of the Company's successor independent registered public accounting firm concerning the subject matter thereof.

70.     On April 26, 2013, ITT filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended March 31, 2013 ("10-Q 1Q 2013").

71.     The 10-Q 1Q 2013 falsely stated that as of March 31, 2013, the Company's total assets were $642,986,000, total liabilities were $484,711,000, and total shareholders' equity was $158,275,000.

72.     The 10-Q 1Q 2013 also falsely stated that for the quarter ended March 31, 2013, the Company's net income was $31,130,000, and earnings per share was $1.33.

73.     Additionally, the 10-Q 1Q 2013 falsely reported that the Company was maintaining adequate internal controls over financial reporting.   Under "Controls and Procedures," the 10-Q 1Q 2013 stated:

(a)     Evaluation of Disclosure Controls and Procedures.

We are responsible for establishing and maintaining disclosure controls and procedures ("DCP") that are designed to ensure that information required to be disclosed by us in the reports filed by us under the Exchange Act is: (a) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms; and (b)

accumulated and communicated to our management, including our principal executive and principal financial officers, to allow timely decisions regarding required disclosures. In designing and evaluating our DCP, we recognize that any controls and procedures, no matter how well designed and implemented, can provide only reasonable assurance of achieving the desired control objectives, and that our management's duties require it to make its best judgment regarding the design of our DCP. As of the end of our first fiscal quarter of 2013, we conducted an evaluation, under the supervision (and with the participation) of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our DCP pursuant to Rule 13a-15 of the Exchange Act. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our DCP were effective at the reasonable assurance level as of March 31, 2013.

(b)     Changes in Internal Control Over Financial Reporting.
There were no changes in our internal control over financial reporting that occurred during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

74.     The 10-Q 1Q 2013 was signed by Defendant Fitzpatrick and included signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Modany and Fitzpatrick falsely stating that the financial information contained in the 10-Q 1Q 2013 was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

75.     On July 26, 2013, ITT filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended June 30, 2013 ("10-Q 2Q 2013").

76.     The 10-Q 2Q 2013 falsely stated that as of June 30, 2013, the Company's total assets were $629,473,000, total liabilities were $449,541,000, and total shareholders' equity was $179,932,000.

77.     The 10-Q 2Q 2013 also falsely stated that for the quarter ended June 30, 2013, the Company's net income was $20,859,000, and earnings per share was $0.89.

78.     Additionally, the 10-Q 2Q 2013 falsely reported that the Company was maintaining adequate internal controls over financial reporting.    Under "Controls and Procedures," the 10-Q 2Q 2013 stated:

(a)     Evaluation of Disclosure Controls and Procedures.

We are responsible for establishing and maintaining disclosure controls and procedures ("DCP") that are designed to ensure that information required to be disclosed by us in the reports filed by us under the Exchange Act is: (a) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms; and (b) accumulated and communicated to our management, including our principal executive and principal financial officers, to allow timely decisions regarding required disclosures. In designing and evaluating our DCP, we recognize that any controls and procedures, no matter how well designed and implemented, can provide only reasonable assurance of achieving the desired control objectives, and that our management's duties require it to make its best judgment regarding the design of our DCP. As of the end of our second fiscal quarter of 2013, we conducted an evaluation, under the supervision (and with the participation) of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our DCP pursuant to Rule 13a-15 of the Exchange Act. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our DCP were effective at the reasonable assurance level as of June 30, 2013.

(b)     Changes in Internal Control Over Financial Reporting.

There were no changes in our internal control over financial reporting that occurred during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

79.     The 10-Q 2Q 2013 was signed by Defendant Fitzpatrick and included signed certifications pursuant to SOX by Defendants Modany and Fitzpatrick falsely stating that the financial information contained in the 10-Q 2Q 2013 was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

80.     On October 29, 2013, ITT filed its quarterly report with the SEC on Form 10-Q for the fiscal quarter ended September 30, 2013 ("10-Q 3Q 2013").

81.     The 10-Q 3Q 2013 falsely stated that as of September 30, 2013, the Company's total assets were $608,961,000, total liabilities were $407,964,000, and total shareholders' equity was $200,997,000.

82.     The 10-Q 3Q 2013 also falsely stated that for the quarter ended September 30, 2013, the Company's net income was $18,941,000, and earnings per share was $0.81.

83.     Additionally, the 10-Q 3Q 2013 falsely reported that the Company was maintaining adequate internal controls over financial reporting.     Under "Controls and Procedures," the 10-Q 3Q 2013 stated:

(a)     Evaluation of Disclosure Controls and Procedures.

We are responsible for establishing and maintaining disclosure controls and procedures ("DCP") that are designed to ensure that information required to be disclosed by us in the reports filed by us under the Exchange Act is: (a) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms; and (b) accumulated and communicated to our management, including our principal executive and principal financial officers, to allow timely decisions regarding required disclosures. In designing and evaluating our DCP, we recognize that any controls and procedures, no matter how well designed and implemented, can provide only reasonable assurance of achieving the desired control objectives, and that our management's duties require it to make its best judgment regarding the design of our DCP. As of the end of our third fiscal quarter of 2013, we conducted an evaluation, under the supervision (and with the participation) of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our DCP pursuant to Rule 13a-15 of the Exchange Act. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our DCP were effective at the reasonable assurance level as of September 30, 2013.

(b) Changes in Internal Control Over Financial Reporting.

There were no changes in our internal control over financial reporting that occurred during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

84.     The 10-Q 3Q 2013 was signed by Defendant Fitzpatrick and included signed certifications pursuant to SOX by Defendants Modany and Fitzpatrick falsely stating that the

financial information contained in the 10-Q 3Q 2013 was accurate and disclosed any material changes to the Company's internal controls over financial reporting.

85.     On January 30, 2014, ITT issued a press release announcing its financial results for the three month period and fiscal year ending on December 31, 2013.  The press release falsely stated that as of December 31, 2013, the Company's total assets were $672,273,000, total liabilities were $469,030,000, and total shareholders' equity was $203,243,000.

86.     On March 21, 2014, the Company issued a press release announcing that it submitted an inquiry to the Office of the Chief Accountant of the SEC ("OAC") related to the accounting treatment for the variable interest entity involved in the PEAKS Program.

87.     The March 21, 2014 press release thus stated, in pertinent part:

The SEC's ongoing investigation of the Company related to the Company's actions and accounting associated with, among other things, the PEAKS Program has led to additional analyses and reviews being conducted by the Company related to the accounting treatment of the PEAKS Program, which additional analyses and reviews have resulted in delays in completing the Company's financial statements and related disclosures. The Company submitted a preclearance request to the Office of the Chief Accountant of the SEC on March 18, 2014 relative to the accounting treatment for the variable interest entity involved in the PEAKS Program, and the Company is also continuing to work to complete other items necessary to finalize the Company's financial statements, footnotes and related disclosures.

88.     The March 21, 2014 press release also stated that:

[o]n March 19, 2014, the Company received a notice from NYSE Regulations, Inc. that, as a result of the Company's failure to timely file its Annual Report on Form 10-K for the fiscal year ended December 31, 2013 (the "2013 Form 10-K"), the Company is subject to the procedures set forth in the New York Stock Exchange's ("NYSE") Listed Company Manual, Section 802.01E, "SEC Annual Report Timely Filing Criteria."  The Company was required to file its 2013 Form 10-K on or before March 18, 2014 ("Extended Filing Due Date"), since the Company timely filed a Form 12b-25 with the Securities and Exchange Commission (the "SEC") to extend the original filing due date of March 3, 2014.

89.     On May 22, 2014, ITT issued a press release entitled, "ITT Educational Services, Inc. Reports Preliminary 2014 First Quarter Results And Provides Update On Status Of Financial Statements."

90.     The May 22, 2014 press release stated, among other things, that the Company was withdrawing its previously-disclosed internal goals for the twelve-month period ending on December 31, 2014, which should no longer be relied upon due to uncertainties pertaining to whether ITT was required to consolidate the PEAKS Trust in the Company's consolidated financial statement.

91.     The May 22, 2014 press release stated, in pertinent part:

As previously disclosed, the company has submitted an inquiry to the Office of the Chief Accountant (the "OCA") of the Securities and Exchange Commission (the "SEC") related to the company's accounting treatment of the variable interest entity (the "PEAKS Trust") involved in the PEAKS Private Student Loan Program (the "PEAKS Program"), and has not yet received the OCA's determination regarding that treatment. The company has been consulting with the OCA related to whether the financial results of the PEAKS Trust should be consolidated into the company's financial statements and, if so, during which periods, as well as matters related to the company's accounting for its guarantee obligations under the PEAKS Program. In addition, the company's independent registered public accounting firm has not completed its audit of the company's financial statements for the fiscal year ended December 31, 2013 and has not completed its review of the company's financial statements for the fiscal quarter ended March 31, 2014. Further, until the financial statements for those periods can be finalized following receipt of the OCA's determination, certain additional information related to the performance of the private student loan programs that becomes available to the company must be taken into account.

As a result of the pending OCA determination, certain of the operating data in this release are preliminary and subject to change. The company also reiterates that the preliminary financial and operating information included in the company's press release issued on January 30, 2014 and provided during the conference call on that same day (collectively, the "January 2014 Release") were preliminary and remain subject to change. The finalized, reviewed financial and operating data that will be included in the company's Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2014 (the "First Quarter 2014 Form 10-Q") and the finalized, audited financial and operating data that will be included in the Company's Annual Report on Form 10-K for the fiscal year ended

December 31, 2013 (the "2013 Form 10-K") when filed with the SEC may be materially different from the data included in this release and in the January 2014 Release, based on the OCA's determination, the company's auditor's review and audit and other factors.

In addition, due to the uncertainties related to the accounting treatment of the PEAKS Trust and the company's guarantee obligations under the PEAKS Program, the company is withdrawing its previously-disclosed internal goals for the twelve months ending December 31, 2014, and investors should not rely on those internal goals. The company expects to disclose its revised internal goals for the twelve months ending December 31, 2014 at a later date, following the finalization of its financial statements for the year ended December 31, 2013 and the quarter ended March 31, 2014.

Our inquiry to the OCA relating to the accounting treatment of the PEAKS Trust has caused delays associated with completing the company's financial statements, footnotes and related disclosures for the 2013 Form 10-K and the First Quarter 2014 Form 10-Q. As a result, the company was not able to timely file the 2013 Form 10-K or the First Quarter 2014 Form 10-Q with the SEC. Following receipt of the OCA's determination, the company plans to work diligently to complete its financial statements, footnotes and related disclosures, and to have its independent registered public accounting firm complete the related audit and review. The company's goal is to file the 2013 Form 10-K and First Quarter 2014 Form 10-Q with the SEC as soon as reasonably practicable.

92.     On June 24, 2014, the Company filed a Form 8-k with the SEC announcing that it will need to restate the unaudited financial statements in its Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2013, June 30, 2013 and September 30, 2013, and that they should no longer be relied upon. The Form 8-K provided in pertinent part:

On June 18, 2014, the Audit Committee of the Board of Directors of ITT Educational Services, Inc. (the "Company") determined that, beginning on February 28, 2013, the Company should have consolidated the financial results of the trust (the "PEAKS Trust") that purchased, owns and collects private education loans made under the PEAKS Private Student Loan Program (the "PEAKS Program"), in the Company's consolidated financial statements (the "Consolidation"). The Company had previously treated the PEAKS Trust as an unconsolidated variable interest entity. As previously disclosed, on March 18, 2014, the Company submitted an inquiry to the Office of the Chief Accountant (the "OCA") of the Securities and Exchange Commission (the "SEC") related to whether the financial results of the PEAKS Trust should be consolidated in the Company's consolidated financial statements and, if so, during which periods. On June 18, 2014, the OCA told the Company that it had determined that it would be appropriate for the Company to consolidate the financial results of the PEAKS Trust in the Company's consolidated financial statements at the time that the Company had the substantive

unilateral right to remove the servicer of the private education loans owned by the PEAKS Trust and to consent to a replacement servicer. In consideration of the OCA's determination and following discussions with Company management, the Company's Audit Committee reached its conclusion that the Company should have consolidated the financial results of the PEAKS Trust in the Company's consolidated financial statements beginning on February 28, 2013. The Company's Audit Committee and management have each discussed the matters disclosed in this Item 4.02 with the Company's independent registered public accounting firm, PricewaterhouseCoopers LLP.

The Company had previously concluded that it was not required to consolidate the financial results of the PEAKS Trust in its consolidated financial statements, because it was not the primary beneficiary of the PEAKS Trust. The Company believed that it was not the primary beneficiary of the PEAKS Trust, because it did not have the power to direct the activities that most significantly impact the economic performance of the PEAKS Trust. The Company determined that the activities of the PEAKS Trust that most significantly impact its economic performance involve the servicing of the private education loans owned by the PEAKS Trust. In connection with its inquiry to the OCA, the Company determined that February 28, 2013 was the first date that the Company could exercise its right to terminate the servicing agreement that governs the servicing activities of the private education loans owned by the PEAKS Trust, due to the failure of the entity that performs those servicing activities on behalf of the PEAKS Trust to meet certain performance criteria specified in the servicing agreement. As a result of this analysis and the OCA's determination, the Company concluded that it became the primary beneficiary of the PEAKS Trust on February 28, 2013, which was the first date that the Company could control the activities of the PEAKS Trust that most significantly impact the economic performance of the PEAKS Trust.

As a result of its determination that the Company should have consolidated the financial results of the PEAKS Trust in the Company's consolidated financial statements beginning on February 28, 2013, the Company's Audit Committee concluded that the Company will need to restate the unaudited financial statements in its Quarterly Reports on Form 10-Q for each of the fiscal quarters ended March 31, 2013, June 30, 2013 and September 30, 2013, and that those previously-issued financial statements should no longer be relied upon. Further, the preliminary financial information included in the Company's press releases issued on January 30, 2014 and May 22, 2014, and provided during the conference calls on those same days, should no longer be relied upon. The Company is in the process of preparing restated financial statements for each of the fiscal quarters ended March 31, 2013, June 30, 2013 and September 30, 2013, and its financial statements for the fiscal quarter ended March 31, 2014 and for the year ended December 31, 2013, in each case to consolidate the financial results of the PEAKS Trust in the Company's consolidated financial statements. The Company hopes to file (i) the amendments to its Quarterly Reports on Form 10-Q for the fiscal quarters ended March 31, 2013, June 30, 2013 and September 30, 2013, (ii) its Annual Report on Form 10-K

for the fiscal year ended December 31, 2013, and (iii) its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2014, with the SEC as soon as practicable.

93. The June 24, 2014 Form 8-K also disclosed that due to the required consolidation, "the Company is required to make payments under the PEAKS Guarantee in amounts that will reduce the outstanding principal balance of the PEAKS Senior Debt to the extent necessary to cause the ratio of the assets of the PEAKS Trust to the resulting outstanding PEAKS Senior Debt to equal or exceed the applicable required Asset/Liability Ratio."

94. The June 24, 2014 Form 8-K disclosed that the Company "believes that it will be required to make additional payments under the PEAKS Guarantee of approximately $115.3 million in the remainder of 2014 related to its obligations under the PEAKS Guarantee." The June 24, 2014 Form 8-K thus stated in pertinent part:

> In addition, the PEAKS Trust must maintain a minimum required ratio of assets of the PEAKS Trust to outstanding PEAKS Senior Debt (the "Asset/Liability Ratio"). The minimum required Asset/Liability Ratio is 1.05/1.00. The applicable required Asset/Liability Ratio as of each monthly measurement date, however, is based on the Company's compliance, as of the prior quarterly measurement date, with certain metrics specified in the PEAKS Program documents, including maximum leverage ratios and minimum liquidity amounts. If the Company is not in compliance with those metrics as of the end of a fiscal quarter, the required Asset/Liability Ratio increases to 1.40/1.00, until the monthly measurement date following the end of a succeeding quarter at which the Company is in compliance with those metrics. As a result of the Consolidation and its related impact on the Company's consolidated financial statements, the Company believes that it may not have been in compliance with those metrics at various past measurement dates after February 28, 2013, and may not be in compliance with those metrics in the remainder of 2014. The Company is still evaluating the full impact of the Consolidation on those metrics. If the amount of the assets of the PEAKS Trust does not equal or exceed the outstanding PEAKS Senior Debt by the applicable required Asset/Liability Ratio on a monthly measurement date, the Company is required to make payments under the PEAKS Guarantee in amounts that will reduce the outstanding principal balance of the PEAKS Senior Debt to the extent necessary to cause the ratio of the assets of the PEAKS Trust to the resulting outstanding PEAKS Senior Debt to equal or exceed the applicable required Asset/Liability Ratio. Based on the Company's current estimates, which are based on numerous assumptions and are subject to change, the Company believes that it will be required to make additional payments under the PEAKS

Guarantee of approximately $115.3 million in the remainder of 2014 related to its obligations under the PEAKS Guarantee. That estimated amount is in addition to the approximately $1.4 million previously paid by the Company in 2014 to date under the PEAKS Guarantee and the $40.0 million that the Company paid in March 2014 pursuant to a letter agreement dated as of March 17, 2014 that the Company entered into with the trustee under the PEAKS Program and the holders of the PEAKS Senior Debt. The $40.0 million was applied primarily to make a mandatory prepayment of the PEAKS Senior Debt. Based on the Company's current estimates, which are based on numerous assumptions and are subject to change, the Company believes that, after 2014, it will be required to make additional payments under the PEAKS Guarantee of:

• approximately $3.0 million in 2015;

• no amounts in 2016 through 2019; and

• approximately $29.8 million in early 2020, primarily to pay off the balance of the PEAKS Senior Debt on the maturity date.

95. The June 24, 2014 Form 8-K also disclosed that due to the required consolidation, the Company may be in default in a credit agreement, and thus the associated debt "may be declared immediately due and payable. The borrowings under the Credit Agreement currently total $50.0 million." The June 24, 2014 Form 8-K thus stated in pertinent part:

the Company believes that it may not be in compliance with certain of its covenants at various dates under the Credit Agreement, dated as of March 21, 2012, as amended by the First Amendment thereto dated as of March 31, 2014 and the Second Amendment thereto dated as of May 29, 2014, among the Company, the lenders from time to time party thereto, JPMorgan Chase Bank, N.A., as administrative agent, Bank of America, N.A., as syndication agent, and Wells Fargo, N.A., as documentation agent (the "Credit Agreement). ... If the Company is not in compliance with one or more covenants and is unable to obtain a waiver or an amendment to the Credit Agreement that would allow it to be in compliance with those covenants, the lending commitments under the Credit Agreement may be terminated and all then outstanding borrowings and other amounts owed may be declared immediately due and payable. The borrowings under the Credit Agreement currently total $50.0 million.

96. The June 24, 2014 Form 8-K also disclosed that the Company expects to conclude that its disclosure controls and procedures were not effective as of March 31, 2013, June 30,

2013, September 30, 2013, and December 31, 2013 as a result of identifying at least one material weakness that led to the restatements. The June 24, 2014 Form 8-K thus stated in pertinent part:

> The Company is in the process of assessing the effectiveness of its internal control over financial reporting ("ICFR") and its disclosure controls and procedures in light of the matters disclosed in this Current Report on Form 8-K. The Company will report the results of those assessments in future filings, but expects that, as a result of the identification of at least one material weakness that resulted in the restatement of its unaudited financial statements for the first three fiscal quarters of 2013, it will conclude that its disclosure controls and procedures were not effective as of March 31, 2013, June 30, 2013, September 30, 2013 and December 31, 2013.

97.     On August 4, 2014 the Company issued a press release stating that Defendant Modany notified the Company's Board of Directors that he intended to resign as CEO effective February 5, 2014, and that he resigned as Company Chairman and Director effective August 4, 2014. The press release announced that the Company established a new position, Executive Chairman of the Board, to be filled by Defendant Dean until a new CEO is hired.

98.     On September 19, 2014 the Company filed a Form 8-K with the SEC that disclosed that it had received a Wells Notice from the SEC. The September 19, 2014 Form 8-K thus stated in pertinent part:

> As previously disclosed, the Company has been subject to an investigation by the U.S. Securities and Exchange Commission (the "SEC") concerning two private education loan programs for its students. On August 7, 2014, the Company received a notice from the staff of the Division of Enforcement (the "Staff") of the SEC, notifying the Company that the Staff had made a preliminary determination to recommend that the SEC file an enforcement action against the Company (a "Wells Notice"). According to the Staff, the enforcement action would allege violations of Sections 10(b), 13(a) and 13(b)(2) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13 and 13a-15 under the Exchange Act. The SEC's notice said that the Staff's recommendation may:
>
> •       involve a civil injunctive action, public administrative proceeding and/or cease-and-desist proceeding against us; and

• seek remedies that include an injunction, a cease-and-desist order and monetary relief, including civil monetary penalties.

A Wells Notice is neither a formal allegation nor a finding of wrongdoing. Instead, it is a preliminary determination by the Staff to recommend that the SEC file a civil enforcement action or administrative proceeding against the recipient. Under the SEC's procedures, a recipient of a Wells Notice has an opportunity to respond in the form of a Wells submission that seeks to persuade the SEC that such an action should not be brought. Accordingly, the Company made a submission to the Staff in response to the Wells Notice setting forth why no action should be commenced against the Company. The Company intends to also continue to discuss these issues with the SEC. Although the Company intends to defend itself vigorously against any legal action taken against it by the SEC, the Company cannot predict the outcome of any legal action or whether the matters will result in any settlement. The ultimate outcome of the SEC investigation, any legal action by the SEC or any settlement could have a material adverse effect on the Company's financial condition, results of operations and/or cash flows.

99. The September 19, 2014 Form 8-K also disclosed that the ED determined that the "Company's institutions are not financially responsible" and required that, among other things, the Company's institutions must "submit a letter of credit payable to the ED in the amount of $79,707,879..." The September 19, 2014 Form 8-K thus stated in pertinent part:

As previously disclosed, the Company's institutions did not submit their 2013 audited consolidated financial statements and the compliance audits of their administration of the federal student financial aid programs under Title IV (the "Title IV Programs") of the Higher Education Act of 1965, as amended, in which they participate ("Compliance Audits") to the ED by the June 30, 2014 due date specified in the ED's regulations. As a result, on August 21, 2014, the ED informed the Company that the ED had determined that the Company's institutions are not financially responsible, a determination based solely on the missed submission deadline, and not on an assessment of the Company's financial condition. Based on this determination, the ED, among other things:
• required the Company's institutions to submit a letter of credit payable to the ED in the amount of $79,707,879;

• placed the Company's institutions on heightened cash monitoring for the receipt of Title IV Program funds, instead of the ED's standard advance payment method;

• provisionally certified the Company's institutions to participate in Title IV Programs;

•       requires the Company's institutions to provide the ED with information about certain oversight and financial events, as described further below;

•       requires the Company to be able to demonstrate to the ED that, for the Company's two most recent fiscal years, it was current on its debt payments and its institutions have met all of their financial obligations, pursuant to the ED's standards; and

•       could require the Company's institutions, in future years, to submit their audited financial statements and Compliance Audits to the ED earlier than six months following the end of their fiscal year.

The Company is required to submit the ED Letter of Credit on or before November 4, 2014.  The term of the ED Letter of Credit must be for a period that ends on November 4, 2019.  The Company will be required to adjust the amount of the ED Letter of Credit annually to 10% of the Title IV Program funds received by its institutions in the immediately preceding fiscal year.  The ED may terminate the Company's institutions' eligibility to participate in Title IV Programs, which would have a material adverse effect on the Company's business, financial condition, results of operations and cash flows, if the Company fails to:

•       submit an irrevocable letter of credit payable to the ED in the required amount and for the appropriate term on or before November 4, 2014; or

•       annually adjust the amount of the ED Letter of Credit to the appropriate amount.

Under heightened cash monitoring ("HCM"), before any of the Company's institutions can request or draw down Title IV Program funds from the ED, the institution must:

•       make disbursements to students and parents for the amount of Title IV Program funds that those students and parents are eligible to receive; and

•       compile borrower-level records with respect to the disbursement of Title IV Program funds to each student and parent.

Once the HCM requirements are satisfied, the Company's institutions may request or draw down Title IV Program funds from the ED in an amount equal to the actual disbursements made by the Company's institutions.  The Company's institutions will be subject to HCM until at least November 4, 2019.  The Company has implemented procedures to address the HCM requirements, and believes that compliance with those requirements will not impact the timing of its receipt of Title IV Program funds by more than one business day.

The Company's institutions will be provisionally certified by the ED to participate in Title IV Programs until at least November 4, 2019.  Any institution provisionally certified by the ED must apply for and receive approval by the ED for any substantial change, before the institution can award, disburse or distribute Title IV Program funds

based on the substantial change.  Substantial changes generally include, but are not limited to:

•     the establishment of an additional location;

•     an increase in the level of academic offering beyond those listed in the institution's Eligibility and Certification Approval Report with the ED;

•     an addition of any eligible non-degree education program or short-term training program; or

•     an addition of a degree program by a proprietary institution.

If an institution applies for the ED's approval of a substantial change, the institution must demonstrate that it has the financial and administrative resources necessary to assure the institution's continued compliance with the ED's standards of financial responsibility and administrative capability.  If the Company is unable to obtain the required approvals from the ED for any new campuses or learning sites, or any new program offerings, or to obtain those approvals in a timely manner, its ability to operate the new campuses, add the learning sites or offer the new programs as planned would be impaired, which could have a material adverse effect on the Company's expansion plans.

Further, the Company is required to provide information to the ED about any of the following events within 10 days of its occurrence:
•     any adverse action, including probation or similar action, taken against any of the Company's institutions by their accrediting commissions, their state authorizing agencies or any federal agency;

•     any event that causes the Company to realize any liability that was noted as a contingent liability in its most recent audited financial statements;

•     any violation by the Company of any loan agreement;

•     any failure by the Company to make a payment in accordance with its debt obligations that results in a creditor filing suit to recover funds under those obligations;

•     any withdrawal of the Company's shareholders' equity or net assets by any means, including the declaration of a dividend;

•     any extraordinary loss by the Company, as defined under Accounting Principles Board Opinion No. 30; or

•     any filing of a petition by the Company for relief in bankruptcy court.

The Company's notice to the ED of the occurrence of any of the above events must include the details of the circumstances surrounding the event and, if applicable, the steps the Company has taken, or plans to take, to resolve the issue.

The sanctions imposed on the Company by the ED described above could have a material adverse effect on the Company's financial condition, results of operations, cash flows and ability to meet its contractual and regulatory obligations. Further, there can be no assurance that the Company will be able to submit the ED Letter of Credit in the amount and for the term required by the ED, that the Company will be able to provide the cash collateral required to maintain the ED Letter of Credit or that the Company will be able to obtain any required annual increases in the amount of the ED Letter of Credit. The Company's provision of the cash required under the Credit Agreement to collateralize the ED Letter of Credit will have a material adverse effect on the Company's liquidity, and will significantly reduce the amount of cash that it will have available for other purposes, including to satisfy its future payment obligations under the guarantee arrangements related to the two private education loan programs to which it is subject. The fact that a significant amount of the Company's cash will be held in connection with the ED Letter of Credit could also negatively affect the Company's ability to satisfy the financial metrics of the ED, state education and professional licensing authorities and the accrediting commissions that accredit the Company's institutions.

100. On October 16, 2014 the Company filed ITT filed its amended quarterly report with the SEC on Form 10-Q/A for the fiscal quarter ended March 31, 2013 ("10-Q/A 1Q 2013").

101. The 10-Q/A 1Q 2013 stated that as of March 31, 2013, the Company's total assets were $783,286,000 (previously falsely reported as $642,986,000), total liabilities were $674,601,000 (previously falsely reported as $484,711,000), and total shareholders' equity was $108,685,000 (previously falsely reported as $158,275,000).

102. The 10-Q/A 1Q 2013 also stated that for the quarter ended March 31, 2013, the Company's net *loss* was $17,271,000 (previously falsely reported as net *income* of $31,130,000), and *loss* per share was $0.74 (previously falsely reported as *earnings* per share of $1.33).

103. On October 16, 2014 the Company filed ITT filed its amended quarterly report with the SEC on Form 10-Q/A for the fiscal quarter ended June 30, 2013 ("10-Q/A 2Q 2013").

104.     The 10-Q/A 2Q 2013 stated that as of June 30, 2013, the Company's total assets were $767,578,000 (previously falsely reported as $629,473,000), total liabilities were $637,892,000 (previously falsely reported as $449,541,000), and total shareholders' equity was $129,686,000 (previously falsely reported as $179,932,000).

105.     The 10-Q/A 2Q 2013 also stated that for the quarter ended June 30, 2013, the Company's net income was $20,204,000 (previously falsely reported as $20,859,000), and earnings per share was $0.86 (previously falsely reported as $0.89).

106.     On October 16, 2014 the Company filed ITT filed its amended quarterly report with the SEC on Form 10-Q/A for the fiscal quarter ended September 30, 2013 ("10-Q/A 3Q 2013").

107.     The 10-Q/A 3Q 2013 stated that as of September 30, 2013, the Company's total assets were $739,302,000 (previously falsely reported as $608,961,000), total liabilities were $598,067,000 (previously falsely reported as $407,964,000), and total shareholders' equity was $141,235,000 (previously falsely reported as $200,997,000).

108.     The 10-Q/A 3Q 2013 also stated that for the quarter ended September 30, 2013, the Company's net income was $9,424,000 (previously falsely reported as $18,941,000), and earnings per share was $0.40 (previously falsely reported as $0.81).

109.     On October 16, 2014 the Company filed ITT filed its amended annual report with the SEC on Form 10-K/A for the fiscal year ended December 31, 2013 ("10-K/A 2013").

110.     The 10-K/A 2013 stated that as of December 31, 2013, the Company's total assets were $806,851,000 (previously falsely reported as $672,273,000), total liabilities were

$691,205,000 (previously falsely reported as $469,030,000), and total shareholders' equity was $115,646,000 (previously falsely reported as $203,243,000).

111. According to Generally Accepted Accounting Practices ("GAAP"), a retroactive restatement of financial statements is reserved for material accounting errors "resulting from mathematical mistakes, mistakes in the application of GAAP, or oversight or misuse of facts that existed at the time the financial statements were prepared." SFAS No. 154, Accounting Changes and Error Corrections, ¶ 2h (May 2005); ASC § 250.

112. Since GAAP allows only to restate financial statements for correction of errors that are "material," resulting from "mistakes in the application of GAAP . . . that existed at the time," by acknowledging their intent to restate the Company's financial statements, Defendants have admitted the materiality of the errors in its previously issued financial statements.

113. Additionally, Regulation S-X (17 C.F.R. § 210.4-01(a)(J)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01(a).

114. The 10-Q/A 1Q 2013 also reported that the Company had four material weaknesses in its internal control over financial reporting ("ICFR") as of March 31, 2013 (the Company previously falsely reported that it was maintaining adequate internal controls over financial reporting as of March 31, 2013). Under "Controls and Procedures," the 10-QA 1Q 2013 stated:

*Evaluation of Disclosure Controls and Procedures*

We are responsible for establishing and maintaining disclosure controls and procedures ("DCP") that are designed to ensure that information required to be disclosed by us in the reports filed or submitted by us under the Exchange Act is: (a) recorded, processed, summarized and reported within the time periods specified in the SEC's rules and forms; and (b) accumulated and communicated to our management, including our principal executive and principal financial officers, to allow timely decisions regarding required disclosures. In designing and evaluating our DCP, we recognize that any controls and procedures, no matter how well designed and implemented, can provide only reasonable assurance of achieving the desired control objectives.

At the time that our Quarterly Report on Form 10-Q for the quarter ended March 31, 2013 was filed on April 26, 2013, our Chief Executive Officer and Chief Financial Officer concluded that our DCP were effective at the reasonable assurance level as of March 31, 2013.

Subsequent to that evaluation, our management, including our Chief Executive Officer and Chief Financial Officer, concluded that our disclosure controls and procedures were not effective as of March 31, 2013 because of material weaknesses in our internal control over financial reporting ("ICFR"), as defined in Rules 13a-15(f) and 15d-15(f) of the Exchange Act, described below.

A material weakness is a deficiency, or combination of deficiencies, in ICFR, such that there is a reasonable possibility that a material misstatement of the registrant's annual or interim financial statements will not be prevented or detected on a timely basis.

Our management has concluded that there were four material weaknesses in our ICFR as of March 31, 2013. Specifically, we did not maintain effective internal controls related to:

- the assessment of events that could affect the determination of whether we are the primary beneficiary of variable interest entities in which we hold a variable interest;

- the assessment of the completeness and accuracy of the data maintained by the servicer of the private education loans that are owned by a variable interest entity that we were required to consolidate;

- the review of assumptions and methodologies developed by third-party consultants to project guarantee obligations under the 2009 RSA; and

- the timely identification and communication of information relevant to the private education loan programs to those members of our management who are responsible for our financial reporting processes.

Our management determined that these material weaknesses resulted in adjustments to multiple line items on our financial statements during the preparation of the Company's 2013 annual consolidated financial statements and restatement of the Company's interim consolidated financial statements as of and for the quarterly periods ended March 31, 2013, June 30, 2013 and September 30, 2013 or could result in a material misstatement of our annual or interim consolidated financial statements that would not be prevented or detected on a timely basis. As a result, our management determined that each of these deficiencies constituted a material weakness in our ICFR as of March 31, 2013, and our ICFR was not effective as of that date.

The control deficiency related to our assessment of events that could affect the determination of whether we are the primary beneficiary of a variable interest entity affected multiple line items in our financial statements. See Note 2 – Restatement and Revision of Previously Issued Unaudited Financial Statements of the Notes to Condensed Consolidated Financial Statements for a discussion of the effect that consolidating a variable interest entity beginning February 28, 2013 had on our consolidated financial statements. The control deficiency related to our failure to maintain effective internal controls over the data maintained by the servicer of the private education loans could have resulted in misstatements of the fair value of the private education loans upon consolidation of the variable interest entity and the amount of the allowance for loan losses. The control deficiency related to our review of assumptions and methodologies developed by consultants to project guarantee obligations under the 2009 RSA resulted in adjustments to our loss related to loan program guarantees, other liabilities and related financial disclosures during the preparation of our 2013 consolidated financial statements. The control deficiency related to the identification and communication of information is considered to have contributed to the other identified material weaknesses, as relevant information related to the private loan programs was not provided timely to those individuals responsible for our financial reporting processes or our independent registered accountants.

### Management's Plan for Remediation

Our management and Board of Directors are committed to the remediation of the material weaknesses, as well as the continued improvement of our overall system of ICFR. We are in the process of implementing measures to remediate the underlying causes of the control deficiencies that gave rise to the material weaknesses, primarily through additional review procedures and engaging supplemental resources. We believe these measures will remediate the control deficiencies. However, we have not completed all of the corrective processes, procedures and related evaluation or remediation that we believe are necessary. As we continue to evaluate and work to remediate the control deficiencies that gave rise to the material weaknesses, we may determine that additional measures are required to address the control deficiencies.

We are committed to maintaining a strong internal control environment, and believe that these remediation actions will represent improvements in our ICFR when they are fully implemented. Certain remediation steps, however, have not been implemented or have not had sufficient time to be fully integrated in the operations of our ICFR. As a result, the identified material weaknesses will not be considered remediated, until controls have been designed and/or controls are in operation for a sufficient period of time for our management to conclude that the control environment is operating effectively. Additional remediation measures may be required, which may require additional implementation time. We will continue to assess the effectiveness of our remediation efforts in connection with our evaluation of our ICFR and DCP.

As we continue to evaluate and work to remediate the material weaknesses and enhance our ICFR and DCP, we may determine that we need to modify or otherwise adjust the remediation measures described above. As a result, we cannot assure you that our remediation efforts will be successful or that our ICFR or DCP will be effective as a result of those efforts.

### *Changes in Internal Control Over Financial Reporting*

115.     We evaluated the changes in our internal control over financial reporting that occurred during the quarter ended March 31, 2013 and concluded that the consolidation of the PEAKS Trust and any related changes to internal controls to include the PEAKS Trust in our consolidated financial statements have materially affected, or are reasonably likely to materially affect, our ICFR.

116.     The 10-Q/A 2Q 2013 and the 10-Q/A 3Q 2013 made substantially the same statements that were provided under "Controls and Procedures" in the 10-Q/A 1Q 2013.

117.     On November 4, 2014, the Company filed a Form 8-K filed with the SEC that stated:

On October 31, 2014, JPMorgan Chase Bank, N.A. ("JPMorgan") issued an irrevocable letter of credit (the "ED Letter of Credit") in the amount of $79,707,879.00 payable to the U.S. Department of Education (the "ED") for the account of ITT Educational Services, Inc. (the "Company").  The ED Letter of Credit expires on November 4, 2019.  As previously reported, the ED required, among other things, that the Company submit an irrevocable letter of credit in that amount and for that term, payable to the ED, on or before November 4, 2014, as a result of the Company's institutions' failure to submit

their 2013 audited consolidated financial statements and compliance audits to the ED by June 30, 2014, which caused the ED to determine that the Company's institutions are not financially responsible.

118.    The November 4, 2014 Form 8-K also disclosed that on October 29, 2014 PWC resigned as ITT's independent auditor.

119.    On November 20, 2014, the Company filed a Form 8-K/A filed with the SEC that stated: "On November 14, 2014, the Company filed its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2014, and on November 19, 2014, the Company filed its Quarterly Report on Form 10-Q for the fiscal quarter ended June 30, 2014.  As a result, PWC's engagement as the Company's independent registered public accounting firm ended effective November 19, 2014."

120.    The November 20, 2014 Form 8-K/A disclosed the disagreements that PWC had with the Company.  The November 20, 2014 Form 8-K thus stated in pertinent part:

The reports of PWC on the Company's consolidated financial statements as of and for the years ended December 31, 2013 and December 31, 2012 did not contain an adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope or accounting principles, except that PWC's report on the Company's consolidated financial statements as of and for the year ended December 31, 2013 was modified to include an emphasis of matter paragraph indicating that the Company is subject to risks and uncertainties including litigation, governmental investigations and increasing liquidity pressures that could affect amounts reported in the Company's financial statements in future periods.

During the fiscal years ended December 31, 2013 and December 31, 2012, and the subsequent interim period through November 19, 2014, there were no "disagreements" (as defined in Item 304(a)(1)(iv) of Regulation S-K and the related instructions) between the Company and PWC on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to PWC's satisfaction, would have caused PWC to make reference to the subject matter of the disagreement in connection with its reports, except for a disagreement relating to whether or not the Company was required to consolidate a variable interest entity (the "PEAKS Trust") in its financial statements. In connection with the Company's submission of an inquiry to the Office of the Chief Accountant (the "OCA") of the SEC

related to whether the financial results of the PEAKS Trust should be consolidated in the Company's consolidated financial statements and, if so, during which periods, the Company concluded that it was not required to consolidate the PEAKS Trust. PWC had evaluated the matter which was the subject of the submission to the OCA and concluded that the Company should consolidate the PEAKS Trust. As previously reported, in June 2014, the Audit Committee of the Board of Directors of the Company determined that, beginning on February 28, 2013, the Company should have consolidated the PEAKS Trust in the Company's consolidated financial statements. As a result, the disagreement on this matter was resolved to PWC's satisfaction. The Audit Committee of the Board of Directors of the Company has discussed the subject matter of the disagreement with PWC, and the Company has authorized PWC to respond fully to the inquires of the Company's successor independent registered public accounting firm concerning the subject matter thereof.

During the fiscal years ended December 31, 2013 and December 31, 2012, and the subsequent interim period through November 19, 2014, there were no "reportable events" (as described in Item 304(a)(1)(v) of Regulation S-K), except for the material weaknesses in the Company's internal control over financial reporting as of December 31, 2013. As disclosed in the Company's Annual Report on Form 10-K for its fiscal year ended December 31, 2013, the Company's management concluded that the Company did not maintain effective internal control over financial reporting as of December 31, 2013 as a result of four material weaknesses described below. Specifically, the Company did not maintain effective internal control related to:

• the assessment of events that could affect the determination of whether the Company is the primary beneficiary of variable interest entities in which it holds a variable interest;

• the assessment of the completeness and accuracy of the data maintained by the servicer of the private education loans that are owned by a variable interest entity that the Company was required to consolidate;

• the review of assumptions and methodologies developed by third-party consultants to project guarantee obligations under a risk sharing agreement entered into by the Company on February 20, 2009 (the "2009 RSA") in connection with a private education loan program; and

• the timely identification and communication of information relevant to the private education loan programs to those members of the Company's management who are responsible for its financial reporting processes.

The control deficiency related to the Company's assessment of events that could affect the determination of whether it is the primary beneficiary of a variable interest entity affected multiple line items in the Company's financial statements. See Note 10 –

Variable Interest Entities of the Notes to Consolidated Financial Statements in the Company's Annual Report on Form 10-K for the year ended December 31, 2013 for a discussion of the effect that consolidating a variable interest entity beginning February 28, 2013 had on the Company's consolidated financial statements. The control deficiency related to the Company's failure to maintain effective internal controls over the data maintained by the servicer of the private education loans could have resulted in misstatements of the fair value of the private education loans upon consolidation of the variable interest entity and the amount of the allowance for loan losses. The control deficiency related to the Company's review of assumptions and methodologies developed by consultants to project guarantee obligations under the 2009 RSA resulted in adjustments to the Company's loss related to loan program guarantees, other liabilities and related financial disclosures during the preparation of the Company's 2013 consolidated financial statements. The control deficiency related to the identification and communication of information is considered to have contributed to the other identified material weaknesses, as relevant information related to the private loan programs was not provided timely to those individuals responsible for the Company's financial reporting processes or to its independent registered accountants. The Audit Committee of the Board of Directors of the Company has discussed the subject matter of the material weaknesses with PWC, and the Company has authorized PWC to respond fully to the inquires of the Company's successor independent registered public accounting firm concerning those material weaknesses.

121.     As a result of Defendants' false and misleading statements and breaches of fiduciary duty, the price of ITT common stock traded at artificially inflated prices throughout the Relevant Period.   Before the truth disclosing Defendants' fraud began to be disclosed, the Company's stock price was $29.95 per share at closing on March 21, 2014.

122.     Upon the Company's gradual disclosures of the Defendants' fraud, ITT stock price fell drastically. ITT's stock price fell to $27.21 per share on March 24, 2014.  It fell by $5.30 on May 22, 2014 to close at $20.50 per share.  After September 19, 2014's corrective disclosure, the stock price fell by $2.70 to close at $4.95 per share.

## **DAMAGES TO ITT**

123.    As a direct and proximate result of the Individual Defendants' conduct, ITT has expended and will continue to expend significant sums of money.

124.    Such expenditures include, but are not limited to, legal fees associated with the lawsuits filed against the Company for violations of the federal securities laws and with the SEC investigation and expected enforcement action, and amounts paid to outside lawyers, accountants, and investigators in connection with internal investigations, payments associated with--the Company's belief--that it is "required to make additional payments under the PEAKS Guarantee of approximately $115.3 million in the remainder of 2014 related to its obligations under the PEAKS Guarantee," and that it is in default in a credit agreement for which the associated debt "may be declared immediately due and payable.  The borrowings under the Credit Agreement currently total $50.0 million," and losses caused by ED's requirement that the Company's institutions "submit a letter of credit payable to the ED in the amount of $79,707,879..."

125.    As a direct and proximate result of the Individual Defendants' conduct, ITT has suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties.

## **DERIVATIVE ALLEGATIONS**

126.    Plaintiff brings this action derivatively and for the benefit of ITT to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors and/or officers of ITT, gross mismanagement, abuse of control, and unjust enrichment, as well as the aiding and abetting thereof.

127. ITT is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

128. Plaintiff is, and at all relevant times has been, an ITT shareholder. Plaintiff will adequately and fairly represent the interests of ITT in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

129. Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

130. A pre-suit demand on the Board of ITT is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Jerry Cohen, Morgan, and Odle, and Defendants Dean, Cozzi, Fowler, Lau, Weber, and Yena (collectively, the "Current Directors"). Plaintiff needs only to allege demand futility as to five of the nine Current Directors that are on the Board at the time this action is commenced.

131. Defendant Dean, as the Company's Executive Chairman of the Board and thus non-independent director, was ultimately responsible for the Company's operations, internal controls, and false and misleading statements and omissions from August 4, 2014 through the remainder of the Relevant Period. Moreover, Dean was the Chairman of the Audit Committee throughout the Relevant Period until August 4, 2014. However, in complete abdication of his fiduciary duties, Dean either participated in or was recklessly unaware of the fraudulent scheme

to make the Company appear more profitable and attractive to investors.  As a result, Dean breached his fiduciary duties.  Thus Dean faces a substantial likelihood of liability, and demand upon him is futile and, therefore, excused.

132.    Likewise, Morgan and Defendants Cozzi and Lau, as members of the Audit Committee caused and facilitated the Company's making false and misleading statements of material fact despite that their falsity was known to them as the Company's independent auditor, PWC found and disclosed to them that ITT was required to consolidate the PEAKS Trust in the Company's consolidated financial statements.  Morgan and Defendants Cozzi and Lau acted in violation of the Audit Committee Charter, as they conducted little, if any, oversight of the Company's internal controls over public reporting of transactions and of the Company's conduct, consciously disregarded their duties to monitor such controls over reporting and conduct, and consciously disregarded their duties to protect corporate assets.  The Audit Committee members' complete failure to perform their duties in good faith resulted in fraudulent misrepresentations to the SEC, the investing public, and the Company's shareholders, and in engagement in conduct that was not in the best interest of the Company.  Thus, Morgan  and Defendants Cozzi and Lau face a substantial likelihood of liability for their breach of fiduciary duties.  Because they face a substantial likelihood of liability, any demand upon them is futile.

133.    Similarly, Odle and Defendants Fowler, Weber, and Yena, as Directors during the Relevant Period caused and facilitated the Company's making false and misleading statements of material fact despite that their falsity was known to them as the Company's independent auditor, PWC found and disclosed to them that ITT was required to consolidate the PEAKS Trust in the Company's consolidated financial statements.  Odle's and Defendants Fowler's, Weber's, and

Yena's complete failure to perform their duties in good faith resulted in fraudulent misrepresentations to the SEC, the investing public, and the Company's shareholders, and in engagement in conduct that was not in the best interest of the Company. Thus, Odle and Defendants Fowler, Weber, and Yena face a substantial likelihood of liability for their breach of fiduciary duties. Because they face a substantial likelihood of liability, any demand upon them is futile.

134. Demand is excused as to all of the Current Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the aforementioned scheme, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

135. In complete abdication of their fiduciary duties, all of the Current Directors either participated in or were recklessly unaware of the fraudulent scheme to make the Company appear more profitable and attractive to investors, and to increase the Company stock price. As a result, the Current Directors breached their fiduciary duties. Thus, the Current Directors face a substantial likelihood of liability, and demand upon them is futile.

136. The Current Directors, as members of the Board, were and are subject to the Code of Ethics. The Code of Ethics went well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Ethics required the Current Directors to also adhere to ITT's standards of business conduct. The Current Directors did not comply with the requirements of the Code of Ethics. The Current Directors violated the Code of Ethics by causing the Company to fail to maintain adequate internal controls and to make false and misleading statements of material fact. Because the Current Directors violated the Code of

Ethics, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

137.    Furthermore, demand in this case is excused because the Current Directors, who are named as defendants in this action and who may be the subject of the SEC investigation and defendants in the expected SEC enforcement action, control the Company and are beholden to each other.

138.    Members of the Board have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders.  These conflicts of interest precluded the Board from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand on the Current Directors would be futile.

139.    ITT has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Current Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for ITT any part of the damages ITT suffered and will continue to suffer thereby.  Thus, any demand on the Current Directors would be futile.

140.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgments as it was based on bad faith and intentional, reckless, or disloyal misconduct.  Thus, none of the Current Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists).  As a majority of the Current Directors face a substantial likelihood of liability,

they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

141. The acts complained of herein constitute violations of fiduciary duties owed by ITT's officers and directors and these acts are incapable of ratification.

142. The Current Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of ITT. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of ITT, there would be no directors' and officers' insurance protection. Accordingly, the Current Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Current Directors is futile and, therefore, excused.

143. If there is no directors' and officers' liability insurance, then the Current Directors will not cause ITT to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

144. Thus, for the reasons set forth above, all of the Current Directors, and, if not all of them, certainly a majority of the Current Directors, cannot consider a demand with

disinterestedness and independence.  Consequently, a demand upon the Current Directors is excused as futile.

145.    Overall, the Company has and will most likely expend many millions upon millions of dollars in internal investigations and defending the securities class actions and the expected SEC enforcement action.  The Company will also lose substantial sums of money due to being required to--the Company believes--"make additional payments under the PEAKS Guarantee of approximately $115.3 million in the remainder of 2014 related to its obligations under the PEAKS Guarantee," due to being in default in a credit agreement for which the associated debt "may be declared immediately due and payable.  The borrowings under the Credit Agreement currently total $50.0 million," and due to the ED requiring the Company's institutions to "submit a letter of credit payable to the ED in the amount of $79,707,879..." Moreover, the Company's reputation has been severely damaged.  The Company has also wasted a substantial amount of money in compensating the Individual Defendants as directors and officers.  Its market capitalization has been severely diminished and its prospect of raising equity in the future is questionable.   All of this substantial damage stems proximately from the Individual Defendants' conscious and willful breaches of their fiduciary duties, abuse of control, and other malfeasance.

## FIRST CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

146.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

147.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ITT's business and affairs.

148.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

149.     The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of ITT.

150.     In breach of their fiduciary duties owed to ITT, the Individual Defendants willfully participated in misrepresentation of the Company's business operations and prospects, failed to correct the Company's public statements, and failed to properly oversee ITT's business and internal controls, rendering them personally liable to the Company for breaching their fiduciary duties.

151.     The Individual Defendants had actual or constructive knowledge that that they had caused the Company to improperly misrepresent its business operations and prospects and they failed to correct the Company's public statements.  Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though

such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ITT's securities.

152.     The Individual Defendants had actual or constructive knowledge that that they had caused the Company to make material misrepresentations and omissions and to fail to maintain adequate internal controls. Defendants had actual knowledge that ITT was required to consolidate the PEAKS Trust in the Company's consolidated financial statements beginning on February 28, 2013, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of ITT's securities.

153.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

154.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ITT has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, Individual Defendants are liable to the Company.

## SECOND CLAIM

### Against Individual Defendants for Abuse of Control

155.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

156.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence ITT, for which they are legally responsible.

157.    As a direct and proximate result of the Individual Defendants' abuse of control, ITT has sustained significant damages.  As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, ITT has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## THIRD CLAIM

### Against Individual Defendants for Gross Mismanagement

158.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

159.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of ITT in a manner consistent with the operations of a publicly-held corporation.

160.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, ITT has sustained and will continue to sustain significant damages.

161.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

162.    Plaintiff, on behalf of ITT, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Unjust Enrichment

163.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

164.    By their wrongful acts and the omissions of material fact that they caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, ITT.

165.    During the Relevant Period, the Individual Defendants either received bonuses, stock options, or similar compensation from ITT that was tied to the performance or artificially inflated valuation of ITT or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

166.    Plaintiff, as a shareholder and a representative of ITT, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of ITT, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to ITT;

(c)    Determining and awarding to ITT the damages sustained by it as a result of

the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing ITT and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect ITT and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of ITT to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding ITT restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: December 23, 2014

Respectfully submitted,

**PRICE WAICUKAUSKI & RILEY, LLC**

/s/ Brad A. Catlin
Brad A. Catlin
Hammond Block Building
301 Massachusetts Avenue
Indianapolis, Indiana 46204
Telephone: (317) 633-8787
Facsimile: (317) 633-8797
Email: bcatlin@price-law.com

*Liaison Counsel for Plaintiff*

**THE BROWN LAW FIRM, P.C.**
Timothy W. Brown, Esq.
127A Cove Road
Oyster Bay Cove, NY 11771
Telephone: (516) 922-5427
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*